**08 CV 03299**

**JUDGE BUCHWALD**

Martin F. Casey (MFC -1415)
**CASEY & BARNETT, LLC**
317 Madison Avenue, 21st Floor
New York, New York 10017
(212) 286-0225
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
REMA FOODS, INC.

        Plaintiff,

   - against -

AIG GLOBAL MARINE, a division of
American International Group, Inc.; and
RLI INSURANCE COMPANY, a division of
American International Group, Inc.

        Defendants.
-------------------------------------------------------X

**COMPLAINT**

Plaintiff, by its attorneys, CASEY & BARNETT, LLC, for its Complaint, alleges upon information and belief, as follows:

### JURISDICTION

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure seeking coverage under an ocean cargo policy issued by defendant for cargo damage sustained to a consignment of crabmeat transported from Thailand to Baltimore, Maryland via ocean carriage. Jurisdiction is predicated upon 28 U.S.C. § 1333 and the General Maritime Law of the United States.

## PARTIES

2. Plaintiff, Rema Foods, Inc., ("Rema Foods") is a corporation with a place of business located at 140 Sylvan Avenue, Englewood Cliffs, New Jersey 07632, and is the cargo owner of a consignment of 2,930 cartons refrigerated pasteurized crab meat carried from Songkhla, Thailand to Baltimore, Maryland in April 2007. Plaintiff was the assured and loss payee under the Marine Open Policy No. CAR0100049, which was issued by defendants.

3. Defendant, AIG Global Marine, a division of American International Group, Inc., (hereinafter "AIG") is a corporation with a place of business located at 175 Water Street, 14th Floor, New York, New York 10038, was and still is doing business in this jurisdiction.

4. Defendant, RLI Insurance Company, a division of American International Group, Inc. (hereinafter "AIG") is a corporation or other business entity with a place of business located at 9025 North Lindbergh Drive, Peoria, IL 61615, was and still is doing business in this jurisdiction.

5. Defendants AIG Global Marine and RLI Insurance Company (together "AIG") were and are engaged in the business of underwriting marine cargo and other insurance risks and issued Marine Open Policy No. CAR0100049.

## RELEVANT FACTS

I. **The Insurance Policy.**

6. AIG issued Marine Open Cargo Policy No. CAR0100049 ("the policy") to Rema Foods, Inc. The policy became effective as of December 1, 2006.

7. The Valuation Clause states that Goods are to be valued at CIF + 25%.

8. The "Goods Insured" Clause provides that the policy covers packaged, canned and bottled foods, vegetables, fruits, fish, oils, and sauces incidental to the business of the Insured, properly packed for the intended voyage.

9. The policy covers ocean shipments worldwide and also covers US and Canada Domestic Inland Transit. The policy attaches from the time the goods leave the warehouse and/or location at the place named in the Policy for the commencement of the transit and continues during the ordinary course of transit until the goods are discharged form the vessel and the final port and thereafter continues while the goods are in transit to the final warehouse at the destination named in the Policy.

10. The policy limits include $5,000,000 for cargo traveling underdeck on an ocean vessel and $1,000,000 for domestic inland transit in the United States.

11. Effective January 24, 2006 the policy was amended to include a 12 Hour Breakdown Clause (Storage) and a Spoilage Endorsement Clause. The 12 Hour Breakdown Clause (Storage) provides:

> This Policy covers against all risk of physical loss or damage from any external cause irrespective of percentage, but excluding nevertheless, the risks of war, strikes, riots, seizure, detention, and other risks excluded by the F.C. & S. Warranty and the S.R. & C.C. Warranty in this Policy, unless otherwise specifically covered by endorsement; also excluding all loss, damage or deterioration due to or caused by the lack of or faulty temperature control equipment. It is however agreed that only while goods and merchandise are stowed at temperature controlled cold storage facilities this insurance is intended to cover loss, damage or deterioration due to, or caused by derangement, breakdown, or stoppage of temperature control equipment, provided such derangement, breakdown or stoppage continues for not less than twelve (12) consecutive hours.

The Spoilage Endorsement provides:

> In regards to refrigerated shipments of Pasteurized Crabmeat, the following additional conditions apply:
>
> If as a result of a covered peril and upon the Assured providing acceptable documentation, this policy also covers loss resulting from the above item being stored at a temperature of 40F or higher for a period of four hours or longer.

12. The Insuring Conditions Clause states that the policy covers "against all risks of direct physical loss or damage from any external cause..."

13. The "Control of Damaged Merchandise" clause states:

> Notwithstanding anything to the contrary contained elsewhere herein, it is understood and agreed that in case of damage to goods insured under this Policy, the Assured is to retain control of all damaged goods. The Assured, however, agrees wherever practical to recondition and sell goods after removal of all brands and trademarks.
>
> Where the disposal or sale of such damaged goods is, in the opinion of the Assured, detrimental to their interests (or which they are unable to sell or dispose of under their agreement with any trade association) such damage shall be treated as a constructive total loss and the Assured shall dispose of the damaged goods to the best advantage, underwriters being entitled to such proceeds, or they shall be destroyed in the presence of underwriters and the Assured.

14. The "Constructive Total Loss" Clause states:

> No recovery for a constructive total loss shall be had hereunder unless the property insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its value when the expenditure had been incurred.

15. The "Returned or Refused Shipments" Clause states:

> In the event of refusal or inability of the Assured or consignee to accept delivery of the property insured hereunder, this insurance is extended to cover such property at its original insured value and subject to the original insuring conditions of this Policy during return and/or until otherwise disposed; provided, however, the goods and/or merchandise are properly packed for the return voyage.

16. The "Sue and Labor" Clause states:

In case of any imminent or actual loss or misfortune, it shall be necessary for the Assured, their factors, servants and assigns, to sue, labor and travel for, in, and about the defense, safeguard and recovery of the interest insured, or any part thereof, without prejudice to this insurance, the charges whereof this Company shall bear in proportion to the sum hereby insured. It is expressly declared and agreed that no acts of this Company or the Assured in recovering, saving, or preserving the property insured shall be considered as a waiver or acceptance of abandonment.

## II.    Events Giving Rise to Rema Foods' Loss.

17. On or about March 1, 2007 plaintiff entered into purchase order R63333 with Pakfood Public Company, Ltd. in Thailand for the purchase and delivery of 2,930 cartons (12 – 1 lb. cans) of Refrigerated Pasteurized Crabmeat – "Blue Water" Brand. The purchase price, evidenced by Invoice no. US/REMA-213/PK50, was $288,486.00 (C&F Baltimore).

18. The consignment, which consisted of various assorted sizes, was loaded into refrigerated container no. MWCU 650970-5, and the container was set at 1 degree Celcius.

19. On or about March 2, 2007 the sealed container was delivered to Maersk – the ocean carrier, at the port of Songkhla, Thailand for delivery to Baltimore, Maryland via Malaysia and Norfolk, Virginia pursuant to Maersk bill of lading number MAEU 512176615 dated March 2, 2007.

20. The container was discharged by Maersk in Norfolk, Virginia on April 6, 2007 and was delivered by barge to Baltimore, Maryland on April 10, 2007.

21. On or about April 13, 2007, the container was picked up from the ocean terminal by Marine Transport, a trucking company hired by plaintiff. The trucking company transported the container to its storage yard, located at 2200 Broening Highway in Baltimore, Maryland.

22. The container was last seen at this storage yard at 0100 hours on April 15, 2007. At 0400 hours on April 15, 2007 the container was noted as being missing.

23. The container was located at or about 0830 hours on April 16, 2007 in Jessup, Maryland – about 5 miles from the marine terminal. The container was empty.

24. . The container's cooling unit had been turned off on April 15, 2007 at approximately 0630 hours.

25. On April 23, 2007, investigating detectives located and recovered a certain portion of the stolen crabmeat in a refrigerated trailer at an industrial park in Curtis Bay, Maryland.

26. A total of 542 assorted cases, with an invoice value of $73,575.60 were determined to have been stolen and were deemed a total loss by defendant. Defendant agreed to, and did remit to plaintiff, the full insurance proceeds for this portion of the claim.

27. The balance of the consignment, 2,388 assorted cases, was recovered on April 23, 2007 and delivered to Merchant's Terminal in Jessup, Maryland, the original intended destination warehouse, on April 24, 2007.

28. Temperature monitoring devices had been placed in two random cases at the commencement of transit. One of these devices was recovered. The information recorded demonstrated that the temperature experienced by this particular carton did not exceed 40 degrees F. at any time.

29. Notwithstanding this determination, from the time the original refrigerated container cooling unit was turned off at 0630 hours on April 15, 2007 until the consignment was found eight days later, on April 23, 2007, there were no temperature records available to demonstrate that each can in each carton had remained below 40 degrees F as required by FDA regulations.

30. Moreover, due to the fact that the chain of custody and been broken, plaintiff could not determine or demonstrate that each can in each carton had not been doctored with or otherwise adulterated and/or damaged by those who had custody and control of the product.

31. In May, 2007, certain of the cans (taken at random) were tested by an independent lab and found to be in accordance with FDA requirements. A total of 7 cartons were tested. The invoice value of these seven cases, $853.44, was deemed covered by underwriters as part of plaintiff's covered loss.

32 Notwithstanding the lab results, plaintiff's customer refused to accept the balance of the goods, 2,381 cases, due to the fact that there was a break in the chain of custody and due to the significant health risks associated with placing such a product into the stream of human commerce. To do so would be a breach of its own Procedures and Guidelines.

33. Plaintiff likewise refused to consent to the placement of this product into the stream of human commerce because it could not guarantee the safety of each individual can, absent a showing that each had remained within required temperature guidelines. Inasmuch as it was unknown how long each can and carton had been without proper refrigeration, plaintiff could not guarantee that its product was in compliance with FDA requirements and regulations.

34. Due to the concern over the break in the chain of custody of the product and due to the concern that the product may have experienced temperatures greater than that permitted by the FDA for pasteurized crabmeat, plaintiff would necessarily need to test each individual can prior to placing it into the stream of commerce. Such an endeavor would necessarily result in the destruction of the entire consignment.

35. Absent the aforementioned testing, Plaintiff deems the property unfit for use in that it is unsafe for human consumption.

36. The foregoing resulted in the declaration that the product is a constructive total loss as the required testing of the product would leave nothing available for resale to the public.

37. The damages sustained by Rema Foods were anticipated risks insured by defendants and occurred during the period of time covered by the Policy.

**III.    Notice and Submission of the Claim by Plaintiff.**

38. Rema Foods promptly notified defendant with respect to its claim and defendant had surveyors present to inspect the product as of April 26, 2007.

39. In May, 2007, Rema Foods submitted its claim to AIG with all supporting documentation.

40. After consideration of the claim, AIG agreed to pay for the portion of the product stolen, plus the seven cartons that underwent testing and refused to pay for the cargo that was found and returned. The total amount paid by AIG was $92,036.30.

41. On September 12, 2007, AIG issued its declination of the balance of Rema Foods' claim, covering the product that was recovered eight days after the theft.

## AS AND FOR A FIRST CAUSE OF ACTION

42. Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs 1 through 41, as if herein set forth at length.

43. Plaintiff has suffered a loss of its cargo due to it being stolen during transit from Thailand to Baltimore, Maryland.

44. The above losses are covered under the subject Policy.

45. All conditions precedent to recover under the Policy, if any, have either been satisfied, waived or are the subject of estoppel.

46.   In breach of its Policy, AIG has failed and / or refused to remit the full insurance proceeds to Plaintiff, as required by the Policy.

47.   As a result of the foregoing, AIG is liable to Rema Foods for damages, including for the total loss of its cargo and the costs associated with Rema Food's efforts to mitigate its loss in the amount to be shown with specificity at trial, but no less than $175,000.00.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants and requests that the Court order Defendants to pay the full proceeds under the Policy, costs incurred to mitigate the damages, storage costs and other expenses all in the total amount of approximately $175,000.00 together with interest, costs and disbursements of this action, and such other and further relief as to the Court appears just and proper.

Dated: New York, New York
April 2, 2008
301-01

                    **CASEY & BARNETT, LLC**
                    Attorneys for Plaintiff

                    */s/ Martin F. Casey*
                    Martin F. Casey (MFC-1415)
                    317 Madison Avenue, 21st Floor
                    New York, New York 10017
                    (212) 286-0225